**MINNESOTA–IOWA TELEVISION COMPANY,**
**Respondent-Appellant,**

v.

**WATONWAN T.V. IMPROVEMENT ASSOCIATION, Appellant-Respondent.**

**Nos. 50290, 50348.**

Supreme Court of Minnesota.

May 30, 1980.

Leonard, Street & Deinard, Sidney Barrows and Charles A. Mays, Minneapolis, for respondent-appellant.

Birkholz & DeHenzel, Daniel A. Birkholz and Robert J. DeHenzel, Jr., St. James, for appellant-respondent.

YETKA, Justice.

Minnesota-Iowa Television Company (hereinafter "KAAL") brought this action against Watonwan T.V. Improvement Association (hereinafter "Watonwan") to enforce the terms of a contract between them. On March 30, 1979, the Fifth Judicial District Court granted KAAL's request for a temporary restraining order (TRO) but stayed the TRO until April 13. On April 9, Watonwan filed a notice of appeal from the granting of the TRO and sought in this court both a stay of the TRO and a writ of prohibition against the district court. Both requests were denied on April 13, and the TRO went into effect.

In the interim, Watonwan applied on April 2 to the Chief of the Broadcast Bureau of the Federal Communications Commission (FCC) for a ruling as to the validity of the contract under FCC regulations. On April 5, the Bureau Chief denied the request. Watonwan then presented its petition to the full commission of the FCC on April 10. That petition is still pending, and the parties state it is not possible to know when the FCC will rule on the petition.

On May 22, the case came on for trial by the district court without a jury. On June 16, the court entered its findings of facts and conclusions of law and ordered Watonwan to comply with the contract for the balance of its term. Judgment was entered accordingly on June 21. On June 29, KAAL moved for amended findings to provide for an award of attorneys' fees. On July 2, Watonwan filed a notice of appeal from the June 21 judgment. Because of the appeal, the trial court ruled that it lacked jurisdiction over the pending motion. On July 18, KAAL filed a notice of appeal from the June 21 judgment as to the denial of attorneys' fees and punitive damages. We affirm as to both appeals.

The Minnesota-Iowa Television Company ("KAAL") owns and operates KAAL–TV in Austin, Minnesota. Watonwan is a nonprofit organization which operates a translator station in Watonwan County, Minnesota. A translator station is essentially an antenna which picks up and rebroadcasts stations which cannot be otherwise received by individuals in the locality.

On July 1, 1975, KAAL entered into a contract with Watonwan for Watonwan to carry the station's signal on its equipment. A provision of the contract provided that Watonwan would not carry any signal which duplicated KAAL's network programming. The provision did not preclude any station from being carried, but only the network programming of any station which would duplicate KAAL; local programming would be permitted.

At all relevant times, KAAL has been affiliated with the ABC television network. At the time the contract was entered into, Watonwan was also carrying the signal of KSTP–TV from St. Paul. At that time KSTP was affiliated with NBC, but on March 5, 1979, KSTP changed affiliation to ABC.

Watonwan initially decided to comply with the contract and drop KSTP's signal. However, after hearing from both KSTP and KAAL, it decided to put KSTP back on its system. Watonwan feared it would be sued by one side no matter what it decided. KAAL would not indemnify it against KSTP, but KSTP offered to indemnify it against KAAL. Watonwan and KSTP then entered into an indemnification agreement and KSTP was put back on the air.

KAAL thereafter brought this suit against Watonwan to enforce the non-duplication provision. It claims, essentially, that duplication of ABC programming in Watonwan County will cause it to lose part of its audience. It claims that the loss of audience will harm its ability to sell advertising time, which is the heart of its income. Watonwan claims that KAAL will not lose enough of an audience to affect its advertising rates. It also claims the contract provision is invalid under antitrust laws. Because the antitrust claim and the validity of the trial court's findings as to the harm KAAL will suffer are both issues raised on appeal, a detailed statement of facts on those issues will be postponed until those issues are considered below.

The issues presented in this case are:

I. Should the FCC be allowed to rule on the validity of the non-duplication provision under its rules and policies before a Minnesota court passes on the validity of it under state law, and does the injunction in this case violate federal law?

II. Is the antitrust claim barred by the statute of limitations, laches, or unclean hands?

III. Does the non-duplication provision violate the Minnesota Antitrust Law?

IV. Were the trial court's findings with regard to the injunction clearly erroneous?

V. In addition to the injunction, is KAAL entitled to an award of:

    A. Punitive damages?

    B. Attorneys' fees?

I. The first question in this case is whether this court should proceed to a resolution of this case or whether it should defer ruling until the FCC has an opportunity to rule on the validity of the contract provision in dispute. This question is involved in two separate areas: (1) with regard to the antitrust questions; and (2) with regard to the FCC's general policies governing translator stations and/or non-duplication provisions.

■ Watonwan claims that the FCC has "primary jurisdiction" over this case. The "primary jurisdiction" doctrine provides that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created * * * for regulating the subject matter should not be passed over." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952), quoted in *State, by Pollution Control Agency v. United States Steel Corp.*, 307 Minn. 374, 380, 240 N.W.2d 316, 319 (1976). "Court jurisdiction is not thereby ousted, but only postponed." *United States v. Philadelphia National Bank*, 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963).

■ With regard to the antitrust issues involved here, the court is not required to allow the FCC to pass on them first. The U. S. Supreme Court in *United States v. Radio Corporation of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959), held that the FCC does not have regulatory authority in the antitrust field such as to insulate actions approved by the FCC from an antitrust action brought by the United States. The court, therefore, held that the FCC does not have primary jurisdiction in the antitrust area.

■ With regard to the validity of the contract provision under the FCC's own rules and policies, the primary jurisdiction doctrine does not require this court to await the agency's decision because the FCC and this court are not being asked to rule on the same question. This court is not asked to rule on the validity of the contract provision under the FCC's rules and policies, but rather on the validity of the provision under state law. Thus, there is no question re-

quiring us to defer jurisdiction to that agency.

■ However, we must also consider whether we should await the FCC decision, either as a matter of convenience or as a matter of comity. In determining whether this court should await the agency's decision, there are at least two relevant factors: (1) how long a delay would result; and (2) the likelihood that the FCC will invalidate the contract provision. The parties state that there is no way to estimate the time delay which might be involved. However, on the second point, the Chief of the Broadcast Bureau of the FCC has already denied Watonwan's petition. The Chief stated:

> The petitioner does not direct us to any Commission rule that prohibits the type of nonduplication protection required by the subject contract provision, and we know of none. * * *
>
> Likewise, as to existing Commission policy, we have not been directed to any cases which specifically involve the propriety of voluntary nonduplication protection agreements between translators and their primary stations, and we know of none.

Watonwan has appealed that ruling to the full commission and, in light of the Chief's letter, is apparently asking the commission to adopt a new policy prohibiting such agreements. In light of the preliminary ruling by the Chief of the Broadcast Bureau and due to the fact that an early decision is unlikely, we decline to defer a decision by this court.

■ Watonwan argues that the injunction is invalid because it "modifies" its FCC license which only the FCC has the authority to do. This is not a valid objection to the injunction because the injunction does not actually modify the license at all. It does not change any of the actual terms of the license, such as the name of the licensee, the effective date, the channels, or any other term.

■ Watonwan states that KSTP is its "primary station" but does not indicate how that fact is of any significance. The FCC rules on translator stations define a primary station as "[t]he television broadcast station which provides the programs and signals being retransmitted by a television broadcast translator station." 47 C.F.R. § 74.701(b) (1979). Under this definition, KAAL and any other station being rebroadcast by Watonwan would be primary stations also. The definition only distinguishes the translator station from the station which is the originator of the programming. It does not specify that there can only be one or that the translator must carry any portion of its programs. Also, as KAAL notes, the license permits, but does not require, Watonwan to carry the signal of KSTP.

■ Watonwan also argues that the injunction enjoins the broadcasting of programming which Watonwan has a FCC license to broadcast and questions whether a state court may validly grant such an injunction. The question is first one of characterization. Watonwan argues that the injunction prevents it from broadcasting matter which it has a FCC license to broadcast. KAAL replies that it is not the injunction which prevents the broadcasting, but the contract which Watonwan voluntarily entered into. The court only ordered Watonwan to comply with the contract, KAAL's argument continues, and did not itself say what Watonwan could and could not broadcast. However, it is clearly the ultimate effect of the injunction to prevent Watonwan from carrying KSTP's ABC programming.

If the injunction is viewed as preventing the broadcasting of licensed programming, it raises an important question of the jurisdiction of a state court when its actions affect a field regulated by the FCC. The U. S. Supreme Court dealt with this problem in *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 65 S.Ct. 1475, 89 L.Ed. 2092 (1945). In that case, the owner of a station had leased the station and transferred its FCC license, with FCC approval, to the lessee. The state court set aside the lease on the basis of fraud. The state court recognized that only the FCC could return

the license to the owner, but it ordered the parties to "do all things necessary" to secure a return of the license.

The Supreme Court upheld the state court only in part. The court stated:

[I]nsofar as the Nebraska decree orders the parties "to do all things necessary" to secure the return of the license, it hampers the freedom of the Society not to continue in broadcasting and to restrict itself, as it properly may, to its insurance business. Equally does it prevent WOW from opposing a return to the Society, or, as the United States suggests, from seeking another license of its own. These are restrictions not merely upon the private rights of parties as to whom a State court may make appropriate findings of fraud. They are restrictions upon the licensing system which Congress established. It disregards practicalities to deny that, by controlling the conduct of parties before the Communications Commission, the court below reached beyond the immediate controversy and into matters that do not belong to it.

326 U.S. at 130–31, 65 S.Ct. at 1481. The court thus rejected that portion of the state court's order requiring the parties to seek a return of the FCC license.

However, the court stated that the "most troublesome question raised" was that the state court order setting aside the lease resulted in the separation of the leased station property from the broadcast license. *Id.* at 131, 65 S.Ct. at 1481. The court recognized that "[t]he result may well be the termination of a broadcasting station." *Id.* Nevertheless, the court upheld the state court action, saying:

We have no doubt of the power of the Nebraska court to adjudicate, and conclusively, the claim of fraud in the transfer of the station by the Society to WOW and upon finding fraud to direct a reconveyance of the lease to the Society. * * * we find nothing in * * * [the Communications Act] that dislodges the power of the States to deal with fraud merely because licensed facilities are involved. * * *

* * * the State has not been deprived by federal legislation of the practical power to terminate the broadcasting service by a proper adjudication separating the physical property from the license.

*Id.* at 131–32, 65 S.Ct. at 1481–1482. However, in order to allow the FCC to act on the license in time that the public would not be deprived of the benefit of the station, it stated that the state court order would be:

qualified merely to the extent of requiring it to withhold execution of that portion of its decree requiring retransfer of the physical properties until steps are ordered to be taken, with all deliberate speed, to enable the Commission to deal with the new applications in connection with the station.

*Id.* at 132, 65 S.Ct. 1482.

As in *Radio Station WOW, Inc.,* this case involves a matter of pure state law: a judicial remedy for a breach of contract. The fact that the Supreme Court upheld the state court action in that case even though it recognized it might effectively result in the termination of the station is strongly suggestive that the injunction in this case may stand even though it effectively prevents Watonwan from broadcasting material which it has a license to broadcast. The present case is in fact less intrusive since it does not result in the closing of Watonwan's broadcast facilities.

Although the Supreme Court in *Radio Station WOW, Inc.* delayed the state court order until the FCC could act, such a step is not required here. The public will not be deprived of the benefit of the programming since it only duplicated KAAL's signal. Also, there is nothing the FCC can do to alter the situation before the court order goes into effect in this case; there is no license to be transferred here.

The U. S. Supreme Court again considered the relationship between state courts and the FCC in *Regents of the University System of Georgia v. Carroll,* 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363 (1950). In that case, the FCC had required, as a condition of granting a station license, that

the applicant repudiate a contract which the FCC felt made the licensee financially insecure. After the applicant adopted a resolution repudiating the contract, the FCC granted the license. Thereafter, the other party to the contract sued in state court for breach of contract, and the state court awarded damages.

The Supreme Court affirmed the state court action. The petitioners had argued "that a state court judgment should not be allowed to thwart the Commission's efforts to enforce the requirements of the Act." 338 U.S. at 600, 70 S.Ct. at 378. However, after referring back to its decision in *Radio Station WOW, Inc. v. Johnson, supra,* the court stated:

> [T]he Communications Act does not specifically empower the Commission to adjudicate the contractual liability of a licensee for its contracts or to declare a licensee's contracts unenforceable in the courts * * *.
>
> *   *   *   *   *   *
>
> * * * We do not read the Communications Act to give authority to the Commission to determine the validity of contracts between licensees and others.

*Id.* at 600, 602, 70 S.Ct. at 378, 379. The court further stated:

> [T]he Commission's regulatory powers center around the grant of licenses. They contain no reference to any sanctions, other than refusal or revocation of a license, that the Commission may apply to enforce its decisions.

*Id.* at 599, 70 S.Ct. at 377.

■ Thus, even if the FCC disfavored the non-duplication provision, it could not invalidate the contract. It could only use it as a factor in deciding whether or not to renew Watonwan's license. Similarly, the FCC's opposition to such a provision, if it did oppose it, would not be a bar to the enforcement of the contract in this court. On the basis of these two decisions, we hold that the injunction may stand despite its ultimate effect on broadcasting.

■ II. Watonwan raised as an affirmative defense to enforcement of the contract that the contract was illegal as in violation of the Minnesota Antitrust Law. KAAL raises the statute of limitations, laches, and unclean hands as obstacles to considering the antitrust issues on their merits. However, Minn.R.Civ.P. 8.03 requires such issues to be specifically raised in the pleadings. KAAL concedes that it did not do so. As a result, they were not considered by the court below. We therefore decline to consider these issues first on appeal. *Republic National Life Insurance Co. v. Lorraine Realty Corp.,* 279 N.W.2d 349 (Minn.1979).

■ III. KAAL next claims that the non-duplication provision is exempt from antitrust consideration by virtue of Minn. Stat. § 325.8017, subd. 2 (1978), which provides:

> Nothing contained in sections 325.8011 to 325.8028, shall apply to actions or arrangements otherwise permitted, or regulated by any regulatory body or officer acting under statutory authority of this state or the United States.

The interpretation of this exemption is a question of first impression. A recent article on the statute suggests that it creates two distinct exemptions: (1) for actions or arrangements "permitted" by a government; and (2) for actions or arrangements "regulated" by a governmental regulatory agency. Note, *Minnesota Antitrust Law of 1971: Interpretation and Analysis,* 63 Minn. L.Rev. 907, 939–40 (1979). Since antitrust laws should be broadly construed to effectuate their purpose, such exceptions should be narrowly construed. *See Abbot Laboratories v. Portland Druggists Association, Inc.,* 425 U.S. 1, 11, 96 S.Ct. 1305, 1313, 47 L.Ed.2d 537 (1976).

■ We can easily dispose of the argument that because the television industry is "regulated," the actions of stations are exempt. The Supreme Court in *United States v. Radio Corporation of America,* 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959), which held that the FCC does not have primary antitrust jurisdiction, found that there is "no pervasive regulatory scheme"

with regard to the television industry. 358 U.S. at 350, 79 S.Ct. at 466. It relied primarily on its earlier decision in *Federal Communications Commission v. Sanders Brothers Radio Station*, 309 U.S. 470, 474, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940), which held that:

> [T]he [Communications] Act recognizes that the field of broadcasting is one of free competition. The sections dealing with broadcasting demonstrate that Congress has not, in its regulatory scheme, abandoned the principle of free competition.

Thus, there is nothing in the regulation of the television industry by the FCC which exempts the industry as a whole from the antitrust laws.

As to whether the action is "permitted" by the FCC, we note that the question is specifically whether the non-duplication provision itself is permitted. KAAL argues that since the FCC does not prohibit the provision, it permits it. Its argument sweeps too broadly, however, as the FCC obviously does not prohibit many objectionable practices such as price-fixing. To say that if the FCC does not prohibit it, it permits it, is virtually equivalent to arguing that the entire industry is exempt. As noted above, that argument has no merit.

It is notable that Missouri adopted an identical exemption to its antitrust laws except that it changed the word "permitted" to "expressly approved." *See Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 313 (Mo.1979). In that case, the Missouri Supreme Court held the exemption to be an incorporation of the "state action" exemption to antitrust laws first enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In the recent case of *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court made clear that that exemption does not apply to actions merely allowed by states but only to those required by them. The court stated "[i]t is not enough that, as the County Bar puts it, anticompetitive conduct is 'prompted' by

state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." 421 U.S. at 791, 95 S.Ct. at 2015. *See also California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

The foregoing decisions indicate that the exemption from antitrust laws for government approved activities has generally been limited to activities either required or specifically permitted by the government. This is consistent with the principle, previously noted, that exemptions be narrowly construed. Therefore, to prove the provision exempt, KAAL is required to show that the FCC specifically permits the non-duplication agreement.

It appears that the FCC permits such provisions in several areas but has not done so as a general policy with regard to translator stations. It has required non-duplication provisions in two translator cases, *Cedar Rapids Television Co*, 23 F.C.C.2d 969 (1970), and *J. R. Karban*, 18 F.C.C.2d 39 (1969), but it has not done so in this case. The letter from the Chief of the Broadcast Bureau of the FCC, indicating that nothing in its policies or rules prohibits the agreement in this case, cannot be taken as specifically allowing the provision here because doing so would border on holding that anything not specifically prohibited is permitted. Thus, we hold that the provision is not exempt from the antitrust law under section 325.8017, subdivision 2.

Turning to Watonwan's antitrust claims on the merits, it makes two different charges against the non-duplication provision. The first is that it violates Minn.Stat. § 325.8015, subd. 1(3) (1978), which provides:

> Without limiting section 325.8013, the following shall be deemed to restrain trade or commerce unreasonably and are unlawful:
>
> \*    \*    \*    \*    \*    \*
>
> (3) A contract, combination, or conspiracy between two or more persons refusing to deal with another person \* \*.

Unlike section 325.8013, which outlaws restraints of trade which are unreasonable, section 325.8015, subdivision 1(3) declares an agreement not to deal to be *per se* unreasonable and illegal. Also, unlike section 325.8015, subdivision 1(1), which outlaws certain combinations between persons in competition with each other, it is of no consequence under this section that KAAL and Watonwan are not in competition.

█ The question then is simply whether the contract between KAAL and Watonwan constitutes a refusal to deal with KSTP. For a number of reasons, the provision here is unlike the type of agreement classified as a refusal to deal. First, the contract does not refer to KSTP but only to any station carrying ABC network programming. Second, the contract does not prohibit the broadcasting of KSTP's programming but only of ABC programming carried by KSTP; local programming, such as nonnetwork shows, sports events or news programs would not be precluded. Third, the contract does not actually prohibit the ABC programming as such, as it is still broadcast using KAAL's signal. Finally, the contract does not preclude KSTP or other stations from broadcasting in the county by using facilities other than Watonwan's. We therefore hold that the provision in question does not constitute a refusal to deal and does not violate section 325.8015, subdivision 1(3).

If the contract provision is not *per se* illegal, Watonwan next argues that it is illegal under Minn.Stat. § 325.8013 (1978), which provides: "A contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful." The question here is primarily whether the contract provision has an unreasonable impact on commerce. KAAL does not argue that the provision does not impact commerce at all; in fact, the basis of KAAL's suit is that failure to enforce the contract will reduce its ability to charge as high prices for advertising as it now charges.

█ The question of what is an unreasonable restraint is essentially a factual one. The trial court did not make detailed findings on this question but held that: "There is no evidence that the injunction deprives the public of the benefit of competition. The exclusivity provision of the contract does not violate antitrust or anticompetition laws or policies of this State." In order to overturn the factual portion of this finding, this court must have a definite and firm conviction that a mistake has been made. *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81, 88 (Minn. 1979). After reviewing all of the testimony, we cannot say that there was "no evidence" but would agree that there was insufficient evidence to show that the contract results in an unreasonable restraint of trade.

As noted above, the very basis of KAAL's suit is that its ad rates will be depressed if the contract is not enforced. However, the basis of its claim for injunctive relief rather than damages is that the impact cannot be determined with any specificity. The trial court accepted this view, and the evidence bears it out. Although Watonwan is seeking to have the contract declared an unreasonable restraint of trade, it did not present any expert testimony as to the impact of the contract upon the market. Rather, its evidence was based primarily upon concessions obtained from KAAL's witnesses that it wanted the contract clause to prevent competition, that it is the dominant station in the area, and that ABC is the dominant network. In the absence of any specific evidence as to the impact of the contract provision on the advertising market, the trial court's finding must stand. In order to reverse it, this court would be required to hold the provision to be unreasonable as a matter of law, a holding we cannot justify.

█ IV. Watonwan also argues that the trial court's findings in support of the injunction are clearly erroneous. In order to evaluate this argument, it is necessary to consider the evidence in some detail before considering the findings.

The sale of advertising in the television industry depends on ratings given by the national rating organizations, Nielsen and

Arbitron. KAAL–TV is located for rating purposes in the Rochester-Mason City-Austin market. That market is divided into two areas: The Area of Dominant Influence (ADI) and the Total Service Area (TSA). The ADI consists of those counties where one of the market area stations is the dominant station. The TSA consists of effectively all counties in which any people watch one of the stations.

Only the ADI is used for the actual ratings, which are the figures showing which station has what share of the market. Since Watonwan County is not in KAAL's ADI, any duplication of signal there would not affect the ratings received. However, KAAL's evidence showed that many advertisers also rely on the total number of households which a station can deliver, which is calculated for the TSA. Watonwan County is within KAAL's TSA so changes could affect the household count for the TSA.

There are approximately 4,400 market households in Watonwan County. In addition, there are approximately 3,400 households served by cable television systems which pick up their signal from the Watonwan translator. Thus, the potential market in question is 7,800 households.

KAAL presented a Nielsen survey taken on a day when both KAAL and KSTP were carrying ABC programming and both were being rebroadcast by Watonwan. The survey showed that the ABC viewers were evenly divided between the two channels. From this, KAAL's consultant concluded that duplication of KAAL by KSTP would result in the loss of half of KAAL's share of the market in Watonwan County. The evidence indicated that on its best night, KAAL's share without duplication would be 16% of the 7,800 market homes or 1,248 homes. Thus, KSTP's duplication, causing a loss of 50% of those, could cause KAAL to lose 624 market homes.

Watonwan attempted to rebut this showing on three grounds. First, it tried to show that there was an amount of irrationality in KAAL's advertising rates, i. e., that a loss of audience would not necessarily result in lower advertising rates. However, the exhibits on which it relied were shown to be "fallacious" by KAAL's witnesses. For example, one exhibit compares November 1978 ad rates with Arbitron survey results which were not available until after November. No witness for Watonwan testified to their accuracy; they were prepared by counsel. Watonwan has printed revised comparisons in its brief, which must be disregarded because they are not in evidence and were not verified by any witness.

Secondly, Watonwan presented evidence that advertisers rely on the ADI figures which would not be affected by changes in Watonwan County. Its witnesses also stated that if they were interested in Watonwan County, they would purchase advertising from a Mankato station since Watonwan is within the Mankato market area ADI. However, this evidence does not disprove that other advertisers might be interested in the total TSA households KAAL could deliver. Nor does it disprove that, from KAAL's perspective, the loss of one-half of its Watonwan County share might require it to alter the advertising rates it charges.

Finally, Watonwan also presented evidence tending to minimize the importance of Watonwan County to KAAL. For example, the 4,400 households in Watonwan County are only 1% of the 440,000 households in KAAL's TSA. Thus, KAAL's loss of 624 of those homes could only be a small portion of its total share of the TSA market.

Based upon this evidence, the trial court found in relevant part as follows:

8. T.V. stations such as KAAL depend upon the sale of advertising time for its revenue. * * * Stations establish their own rates for advertising time and these depend upon a large number of factors which vary from time to time and from place to place. * * *

9. The factors that a buyer considers in purchasing T.V. advertising time are some of those recited in connection with the rate-making process. * * * From the evidence here, it is not possible to

determine what [factor] has the most persuasive force in deciding what commercial time to buy and when. It is not possible either to determine what factors have the most impact in setting or changing rates. * * * All things considered, this Court cannot say from the evidence what factor or factors are determinative or even of compelling force in an attempt to arrive at what loss of T.V. households or viewers means dollar wise to a station which suffers a viewer loss from duplication.

\*    \*    \*    \*    \*    \*

12. Failure to recognize the exclusivity provision and the consequent signal duplication results in a loss of a considerable number of T.V. householders and viewers in plaintiff's total market or survey area and, more particularly, in the area served by defendant tower and translator.

13. The loss of households and audience will have an eventual impact on plaintiff's ability to sell advertising time and the rates at which it is sold. The exact monetary loss cannot be determined but diminution of a substantial number of households from the viewing audience, as here, is an important factor. The coincidental telephone surveys conducted in April 1979 show a very significant loss of audience as a result of duplication of the ABC signal. The duplication represents a real and present threat to the survival of plaintiff in the defendant's broadcast area even though it is not immediately measurable in dollars.

\*    \*    \*    \*    \*    \*

CONCLUSIONS OF LAW:

\*    \*    \*    \*    \*    \*

4. That as a result of the breach, which is a continuing one, plaintiff has sustained and will continue to sustain irreparable injury in the form of loss of viewing audience and consequent loss of earnings.

After reviewing the evidence, we believe the findings are supported by the evidence. The fact that KAAL will lose viewers is both shown by a Nielsen survey and expert testimony and backed by logic. It seems obvious that if two stations are showing the same program, viewers will be divided between the two.

The only argument of Watonwan that has any force is that the audience loss is too small to be of significance. The merit of this argument is drawn into question, however, by the fact that KSTP itself is trying so vigorously to get its signal into Watonwan County. If the county was insignificant, it would not seem that KSTP would go to the expense of indemnifying Watonwan and representing it so vigorously in an effort to get itself into the county. Thus, KSTP's own actions lend support to the trial court's findings that KAAL would suffer a loss without the injunction.

V.A. The trial court found as a fact that the breach by Watonwan was conscious and deliberate and that it chose to breach rather than resort first to the courts. The trial court also found that KAAL had not shown it was entitled to punitive damages and concluded that the conduct of Watonwan was not such as to entitle plaintiff to punitive or exemplary damages. KAAL argues that the trial court's decision to deny punitive damages was erroneous.

The general rule in Minnesota is that, in the absence of a specific statutory provision therefor, extra-contract damages are not recoverable for breach of contract except in exceptional cases where the breach is accompanied by an independent tort. *Haagenson v. National Farmers Union Property and Casualty Co.*, 277 N.W.2d 648, 652 (Minn.1979); *Olson v. Rugloski*, 277 N.W.2d 385 (Minn.1979). KAAL argues in effect that the conscious and deliberate breach was tantamount to the required independent tort. This court in the *Haagenson* case rejected a similar argument by stating that even if the defendant had had no reason whatever to contest the plaintiff's insurance claim, punitive damages are not recoverable for bad faith breach of contract. Recent decisions in accord are *Moore v. Blomquist*, 256 N.W.2d 518 (Minn.1977), and *Wild v. Rarig*, 302 Minn. 419, 234

N.W.2d 775 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Therefore, the trial court correctly concluded that the intentional breach by Watonwan, in and of itself, was insufficient to justify an award of punitive damages.

■ KAAL asserts, however, that the actions of KSTP in inducing the breach constitute the requisite independent tort; namely, wrongful interference with contract. A similar argument was rejected in *Wild v. Rarig*:

> Dr. Wild does not have a cause of action for wrongful interference with contract since that action does not permit one party to sue another party to the same contract for breaches inter se.

*Wild v. Rarig*, 302 Minn. 419, 443 n. 16, 234 N.W.2d 775, 791 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976).

As KAAL points out, the situation in this case is distinguishable from that in *Wild v. Rarig*. KSTP was not a party to the contract between KAAL and Watonwan. This fact, however, works against KAAL rather than in its favor. It confounds all logic to comprehend how an independent tort by KSTP can form the basis for the punitive damages which KAAL seeks to extract from Watonwan. While KAAL argues that the indemnification agreement between KSTP and Watonwan makes the two entities one and the same, KAAL did not name KSTP as a defendant in this lawsuit. If KAAL felt that it was entitled to punitive damages as a result of tortious conduct on the part of KSTP, then KSTP should have been made a party to this action.

KAAL further claims that the following statute provides an independent reason for the award of punitive damages:

> Subdivision 1. Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.
>
> Subd. 2. Punitive damages can properly be awarded against a master or principal because of an act done by an agent only if:

> (a) the principal authorized the doing and the manner of the act, or
>
> (b) the agent was unfit and the principal was reckless in employing him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.
>
> Subd. 3. Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject.

Minn.Stat. § 549.20 (1978) (effective April 5, 1978). The language in subdivision 1 that punitive damages shall be allowed "in civil actions," KAAL argues, changes established Minnesota law disallowing punitive damages in most contract actions.

■ Section 549.20 was enacted in 1978 in response to concerns which a variety of constituents expressed to the legislature about the awarding of punitive damages in products liability cases. Heins, "Statutory Changes in Minnesota Tort Law—1978," *Hennepin Lawyer*, September-October 1978, at 6.

Testimony to the legislature included expressions of concern that the current national trend in products liability actions

reflects increases in the frequency and amount of punitive damages awards. Section 4 [section 549.20] sets forth standards for the award of punitive damages which parallel those of the common law. *Id.* (written by Dianne Heins, who was then counsel to the Senate Judiciary Committee). Since the concern of the legislature was to limit the frequency and amounts of punitive damages awards, it is unlikely that the legislature intended to extend such damage awards to contract actions. The fact that subdivision 3 recites the standards for the award of punitive damages set out in Minnesota case law further supports the inference that section 549.20 leaves intact the case law prohibition against punitive damages in contract actions. We believe that if the legislature had intended to overrule the line of cases prohibiting punitive damages in contract cases, it would have specifically provided for such awards in the statute. *See Agassiz & Odessa Mutual Fire Insurance Co. v. Magnusson,* 272 Minn. 156, 136 N.W.2d 861 (1965).

For the reasons outlined above, the trial court was correct in denying KAAL's request for punitive damages.

V.B. The trial court found that "[t]here is no proof of the value of attorneys' fees nor any legal basis shown for the allowance of the same." Consequently, the trial court concluded that KAAL was not entitled to recover attorneys' fees. KAAL claims that the trial court's conclusion was erroneous.

In general, attorneys' fees may not be awarded to a successful litigant absent specific contractual or statutory authority. *Cherne Industrial, Inc. v. Grounds & Associates, Inc.,* 278 N.W.2d 81, 96 (Minn. 1979); *Fownes v. Hubbard Broadcasting, Inc.,* 310 Minn. 540, 542, 246 N.W.2d 700, 702 (1976). There is a well-established exception to the rule "where an unfounded action or defense is brought or maintained in bad faith, vexatiously, wantonly, or for oppressive reasons." 6 J. Moore, *Moore's Federal Practice* ¶ 54.77[2] (2d ed. 1976); cited in *Cherne Industrial, Inc. v. Grounds & Associates, Inc., supra,* and *Fownes v. Hubbard Broadcasting, Inc., supra.* A footnote in *Cherne Industrial, Inc. v. Grounds & Associates, Inc.,* 278 N.W.2d at 97 n. 13, indicates that this exception has now been codified as Minn.Stat. § 549.21 (1978). It is section 549.21 upon which KAAL relies for its claim of attorneys' fees.

Minn.Stat. § 549.21 (1978) reads as follows:

Upon motion of a party prevailing as to an issue, the court in its discretion may award to that party costs, disbursements, reasonable attorney fees and witness fees relating to the issue if the party or attorney against whom costs, disbursements, reasonable attorney and witness fees are charged acted in bad faith as to that issue. To qualify for an award under this section, a party shall give timely notice of intent to claim an award, which notice shall in any event be given prior to the resolution of the issue. An award under this section shall be without prejudice and as an alternative to any claim for sanctions that may be asserted under the rules of civil procedure.

In order to justify an award under this statute, the party or attorney must have acted in bad faith as to an issue during litigation. 6 J. Moore, *Moore's Federal Practice* ¶ 54.77[2] (2d ed. 1976), distinguishes between bad faith in litigation and bad faith in the underlying action which is the basis of the suit. Section 549.21 only incorporates bad faith as to an issue in litigation.[1]

In this case, KAAL claims that Watonwan defended the present suit in bad faith but relates no specific examples of bad faith. The only specific instance mentioned by KAAL is that Watonwan was not acting in full good faith in the proceedings before the FCC, which is irrelevant on the

---

1. This reading of the statute is supported by its legislative history. Senator Jack Davies, author of the statute, stated to the Senate Judiciary Committee that this section "forces more responsible litigation by imposing costs including attorneys' fees on a party or his lawyer who presses an issue not in good faith—so people have to search through their lawsuits more effectively for what really ought to be litigated."

issue of attorneys' fees in this case. The issues and defenses brought before this court are not frivolous, but rather are viable issues. Therefore, section 549.21 does not provide a basis for awarding KAAL attorneys' fees.

In resolving this case, we must also consider the equities of the parties. What we have are clear and decisive district court findings that irreparable harm will be sustained by KAAL in the absence of an injunction whereas defendant has an indemnity agreement with KSTP which it readily admitted at oral argument will protect it from any loss. KSTP is not a party to these proceedings and has not demonstrated any loss to it. However, at oral argument, the attorneys representing the defendant admitted they were being paid by KSTP and that KSTP has applied for a permit to build its own tower in the county. In the meantime, KSTP can broadcast its local programs and is only barred from broadcasting over the Watonwan tower the same network programming that the plaintiff is using. While an early FCC decision or the construction of a new tower by KSTP could moot this action, it seems to us that KAAL is, in the meantime, entitled to the protection of the injunction.

The trial court is therefore affirmed.

SHERAN, C. J., and KELLY, J., took no part in the consideration or decision of this case.