Betty NACHTSHEIM, as trustee for the heirs and next-of-kin of Robert P. Nachtsheim, Respondent,

v.

Norman WARTNICK, et al., Appellants.

No. C0–87–99.

Court of Appeals of Minnesota.

Sept. 8, 1987.

Review Denied Oct. 28, 1987.

Ronald I. Meshbesher, Minneapolis, for respondent.

Phillip Gainsley, Minneapolis, for appellants.

Heard, considered and decided by LESLIE, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

SEDGWICK, Judge.

Respondent Betty Nachtsheim (Nachtsheim) brought this wrongful death action under Minn.Stat. § 573.02 (1984) against appellant Norman Wartnick (Wartnick), alleging that he had murdered or procured the murder of her husband. The jury found that Wartnick had committed or caused the murder, and it awarded Nachtsheim $2,350,000 in damages. Wartnick appeals from the judgment and order denying him a new trial. We affirm.

## FACTS

Wartnick is a shareholder and officer of Midwest Florist Supply Co. (Midwest), a wholesale floral company. Midwest is a family-run business founded by Wartnick's father. Robert Nachtsheim (the decedent) worked as a salesman for Midwest between 1959 and 1972.

In April 1970, Wartnick bought a $100,-000 "key man" insurance policy on the decedent's life from Prudential Insurance Co. (Prudential). Midwest was the named beneficiary.

In August 1972, the decedent left Midwest to begin a competing business. On May 11, 1973, three days before the life insurance policy was to lapse, Wartnick paid the annual premium to keep it in effect, even though the decedent no longer worked for Midwest.

On the morning of May 24, 1973, the decedent was fatally shot shortly after he arrived at work. The evidence suggested the killer was someone the decedent knew:

he apparently had let the killer in before opening for business; there was no evidence of robbery or struggle; and the killer shot the decedent in the head at close range from a visible position. A large box of orchids, normally only sold to other wholesalers, had been removed from the cooler and was upside down on the floor near the decedent's body; the cooler door was still ajar when the body was discovered. The police and the Hennepin County District Attorney's office investigated the killing, but no one was charged and it remains officially unsolved.

Prudential paid Midwest the life insurance proceeds (over Nachtsheim's protests). In October 1976, Nachtsheim sued Prudential, Midwest, and Wartnick to recover the proceeds on a theory of unjust enrichment. She alleged that her husband had been overinsured; that he had told Prudential not to renew the policy since he no longer worked for Midwest; that when the premium was paid Midwest had no insurable interest in his life; and that Wartnick had murdered or procured the murder of her husband.

On June 9, 1984, Nachtsheim brought this action against Wartnick and Midwest under Minnesota's wrongful death statute, Minn.Stat. § 573.02 (1984). At the time of the shooting, the statute required that the action be brought within three years of the wrongful act causing death. The statute was amended in 1983, however, to remove any time limit for actions based on murder.

Both lawsuits were consolidated for trial. Prudential settled with Nachtsheim before trial for $75,000.

The jury found by special verdict that Wartnick had murdered or caused the murder of decedent, but that Midwest, acting through Wartnick, had not murdered him or caused the murder. It awarded Nachtsheim $350,000 in compensatory damages and $2 million in punitive damages.

Judgment was entered against Wartnick in the wrongful death action. (The other suit was dismissed since the jury found for

Midwest.) Wartnick appeals from the judgment and the trial court's order denying his motion for a new trial or judgment notwithstanding the verdict.

## ISSUES

1. Does Minn.Stat. § 573.02 (1984) deprive appellant of due process of law by reviving respondent's time-barred wrongful death action against him?

2. Did the trial court abuse its discretion by denying appellant's motion for a new trial?

3. Did the trial court err in submitting the punitive damages issue to the jury?

## ANALYSIS

I. *Revival of Barred Wrongful Death Action.*

Nachtsheim brought this wrongful death action under Minn.Stat. § 573.02 (1984), which provides:

Subdivision 1. * * * *An action to recover damages for a death caused by an intentional act constituting murder may be commenced at any time after the death of the decedent.* Any other action under this section may be commenced within three years after the date of death provided that the action must be commenced within six years after the act or omission.

\*     \*     \*     \*     \*     \*

Subd. 4. This section shall not apply to any death or cause of action arising prior to its enactment, nor to any cause of action or proceeding now pending in any court of the state of Minnesota, *except * * * this section shall apply to any death or cause of action arising prior to its enactment which resulted from an intentional act constituting murder * * *.*

(Emphasis added.)

The underlined language was added by 1983 Minn.Laws ch. 347, §§ 2–3, effective June 15, 1983. It removes retroactively the

three-year time limitation for wrongful death actions based on murder.

The time for Nachtsheim to bring a wrongful death action had expired before the 1983 amendment was enacted: the decedent was shot in May 1973, and the statute then in effect required that the action be brought within three years after the act causing death. Minn.Stat. § 573.02, subd. 1 (Supp.1973). Nachtsheim started this suit in May 1984. Thus, the 1983 amendment, as applied to this case, would revive a cause of action that had previously expired. Wartnick argues the removal of the time limitation deprives him of property without due process of law.

■ Initially, we reject Nachtsheim's contention that Wartnick cannot raise this constitutional argument because he did not plead the statute of limitation in his answer. When Wartnick answered, he had no statute of limitation defense—the time limitation had been removed by the 1983 amendment. His constitutional defense was raised in his answer.

■ The leading Minnesota case analyzing whether a time-barred claim may be revived is *Donaldson v. Chase Securities Corp.*, 216 Minn. 269, 13 N.W.2d 1 (1944), *aff'd*, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945). *Donaldson* involved legislation that revived a common law tort action based on a violation of state securities laws. 325 U.S. at 310–11, 65 S.Ct. at 1140–41. The Minnesota supreme court reasoned that whether this was constitutional depended on which of three types of time limitations was involved. 13 N.W.2d at 4–5.

In the first class of cases, typically involving adverse possession, the passage of time extinguishes not only the plaintiff's remedy, but also his right, and it gives the defendant a vested property right. In such a case, lifting the bar of the statute of limitations violates the defendant's due process rights. 13 N.W.2d at 4.

In the second class of cases, the time limitation only affects the plaintiff's reme-dy, not the parties' rights, and the legislature is free to restore the barred remedy. *Id.* The *Donaldson* court held that the legislation at issue there was constitutional because it removed a limitation of the second type. 13 N.W.2d at 5. Its decision was based in part on *Campbell v. Holt*, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885):

> In *Campbell v. Holt*, the Supreme Court held that a statute which applied merely to the remedy did not vest such a right in the defendant that the Legislature * * * could not lift the bar of the limitation and thereby revive the cause.

13 N.W.2d at 4.

The court noted, however, that certain statutory tort actions could not be revived:

> The case at bar is to be distinguished from a third class of cases where a cause of action is created by statute, such as Lord Campbell's Act * * *, and the same statute prescribes a period of limitation within which the cause must be brought. The weight of authority in such cases is that the period of limitation is a part of the cause of action, and if it is not brought within the time specified, it may not be revived.

13 N.W.2d at 5 (citations omitted).

Lord Campbell's Act is the generic name for wrongful death statutes and is the model for Minnesota's statute. *Bonhiver v. Fugelso, Porter, Simich and Whiteman, Inc.*, 355 N.W.2d 138, 141 (Minn.1984). Actions for wrongful death did not exist at common law; they are a statutory creation. *E.g.*, *Cashman v. Hedberg*, 10 N.W.2d 388, 390 (Minn.1943). The statute's time limit is part of the cause of action itself, rather than an ordinary statute of limitation merely affecting a remedy. *Berghuis v. Korthuis*, 228 Minn. 534, 536, 37 N.W.2d 809, 810 (1949).

The principle that a statutory cause of action cannot be revived where the time limitation is part of the action itself was established in *William Danzer & Co. v. Gulf & Ship Island Railroad Co.*, 268 U.S. 633, 45 S.Ct. 612, 69 L.Ed. 1126 (1925). In

*Danzer,* plaintiff's time-barred cause of action under the Interstate Commerce Act would have been revived by a retroactive tolling provision in the subsequently-passed Transportation Act. The Supreme Court held it would be unconstitutional to revive the barred action:

> We need not re-examine the doctrine of *Campbell* * * *, as it is plain that case does not apply. * * * That case belonged to the class where statutory provisions fixing the time within which suits must be brought to enforce an existing cause of action are held to apply to the remedy only. But such provisions sometimes constitute a part of the definition of a cause of action created by the same or another provision, and operate as a limitation upon liability. *Such for example, are statutory causes of action for death by wrongful act * * *.* This case belongs to the latter class. [The Transportation Act] will not be construed retroactively to create liability. *To give it that effect would be to deprive defendant of its property without due process of law in contravention of the Fifth Amendment.*

268 U.S. at 636–67, 45 S.Ct. at 613 (emphasis added).

Other states have concluded that under *Danzer,* the due process clause of the Fourteenth Amendment prohibits a legislature from reviving a time-barred wrongful death action by retroactively extending the limitation period. *Smith v. Westinghouse Electric Corp.,* 266 Md. 52, 291 A.2d 452 (1972); *Haase v. Sawicki,* 20 Wis.2d 308, 121 N.W.2d 876 (1963).

We believe the preceding authorities do not apply here because none involves a wrongful death action based on murder. *Danzer* and *Donaldson* did not even involve wrongful death actions, so their language regarding such actions is dicta. Both *Smith* and *Haase* involved deaths caused by accidents.

Wartnick's claim, in effect, is that the expiration of the time limitation in the 1973 statute gave him a vested, constitutionally-protected property right in freedom from civil liability for the intentional killing of another. We do not accept the contention that an interest in freedom from civil liability for murder is a property interest worthy of protection under the due process clause. *Cf. Paul v. Davis,* 424 U.S. 693, 710–12, 96 S.Ct. 1155, 1164–1166, 47 L.Ed.2d 405 (interest in reputation not protected by Fourteenth Amendment because it is not "liberty" or "property").

█ Even if Wartnick had such a constitutionally-protected property interest, the 1983 amendment would not be an impermissible infringement of that interest.

In attacking a statute * * * on due process grounds, one bears a heavy burden; the statute * * * need only bear some rational relation to the accomplishment of a legitimate public purpose to be sustainable.

*Manufactured Housing Institute v. Pettersen,* 347 N.W.2d 238, 243 (Minn.1984) (citing *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955)).

The 1983 amendment serves the legitimate public purposes of punishing those who murder (the amendment provides for punitive damages) and compensating the deceased's heirs. Making the statute applicable to causes of action that accrued prior to its enactment (including those previously time-barred) is rationally related to those purposes.

We also note that the most recent Supreme Court case addressing the rule relied on by Wartnick calls into doubt its current validity. In *International Union of Electrical Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976), a fired employee sued her ex-employer for racial discrimination in violation of Title VII of the Civil Rights Act of 1964. The statute required that she file a charge with the Equal Employment Opportunity Commission within 90 days of discharge, and she did not do so until 108 days after discharge. Congress later amended the

statute to extend the time limitation to 180 days and her charge was timely under the amended statute.

The Court held it was constitutional to revive her time-barred claim:

> Respondent contends * * * that Congress was without constitutional power to revive, by enactment, an action which, when filed, is already barred by the running of a limitations period. This contention rests on an unwarrantedly broad reading of our opinion in *William Danzer* * * *. *Danzer* was given a narrow reading in the later case of *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 312, n. 8 [65 S.Ct. 1137, 1141 n. 8, 89 L.Ed. 1628] * * *. The latter case states the applicable constitutional test in this language:
>
> > "The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation. What it does forbid is taking of life, liberty or property without due process of law. * * * [C]ertainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is *per se* an offense against the Fourteenth Amendment." *Id.* at 315–316, 65 S.Ct., at 1143.

429 U.S. at 243–44, 97 S.Ct. at 450–51.

The type of action which the *Robbins & Myers* court found could be constitutionally revived appears indistinguishable from the type held to be unconstitutionally revived in *Danzer*, that is, a statutory action not existing at common law containing a specific time limitation. The *Robbins & Myers* holding and stated "test" of constitutionality therefore indicate a tacit reversal of *Danzer*.

## II. *Motion for New Trial.*

Wartnick contends the trial court erred in denying his motion for a new trial on various grounds. A trial court has broad discretion in deciding whether a new trial is warranted and its decision will not be re-versed absent a clear abuse of discretion. *Helwig v. Olson*, 376 N.W.2d 763, 765 (Minn.Ct.App.1985).

### A. *Evidentiary rulings.*

Wartnick's brief raises a multitude of objections to the trial court's evidentiary rulings. Evidentiary rulings are ordinarily within the sound discretion of the trial court. *McGuire v. C & L Restaurant, Inc.*, 346 N.W.2d 605, 615 (Minn.1984). Many of Wartnick's arguments are made in passing and are hard to decipher. Although we have considered them all, for the sake of brevity we only address the following.

■ 1. Wartnick argues the trial court erred by admitting in evidence portions of his deposition in which he invoked his Fifth Amendment privilege to refuse to answer questions such as the following:

> Can you state whether or not you had anything to do with the murder of Robert Nachtsheim?
>
> Can you state whether or not you personally shot and killed Robert Nachtsheim?
>
> Can you state whether or not you employed somebody to murder Robert Nachtsheim?

Wartnick does not dispute that in a civil action an adverse inference may be drawn from a party's invoking the Fifth Amendment. *See Ralph Hegman Co. v. Transamerica Insurance Co.*, 293 Minn. 323, 198 N.W.2d 555 (1972). Instead, he argues the trial court erred in allowing this deposition testimony to be introduced because it was not used for contradicting or impeaching his testimony. *See* Minn.R.Civ.P. 32.01. The testimony was admitted as direct evidence, however, not for impeachment. Since Wartnick was a party, his deposition was admissible as direct evidence even though he testified at trial. *See* Minn.R.Civ.P. 32.01(2).

■ 2. Wartnick argues the trial court erred in excluding a portion of the Henne-

pin County Medical Examiner's report that states, "There was no obvious motive in the shooting although there were apparently many people who did not like the deceased." The medical examiner testified that he received this information from police investigators, it was not relevant to his medical opinion and he did not know if it was true. It was within the trial court's discretion to exclude this evidence.

■ Wartnick also argues it was error to exclude portions of police investigation records, and he quotes from what apparently is a police summary of a discussion with a friend of the decedent's son. His brief fails to identify the exhibits at issue or the source of the quote, and no police records are in the trial court file. Assuming the quoted material was excluded, it was not error to do so, since it was triple hearsay. Wartnick also complains that he was not permitted to cross-examine a police officer based on the investigation records, but the transcript reveals that the objections sustained were as to form.

■ 3. Wartnick argues it was error to admit police photos and drawings of the scene of the murder and accompanying testimony by two police officers because the evidence was cumulative and unduly prejudicial. Nachtsheim argues the evidence shows that the assailant was not a professional, was familiar with the floral business, knew the decedent, and that robbery was not a motive. It was within the court's discretion to admit this evidence.

■ 4. Nachtsheim called an insurance expert who testified, in effect, that the life insurance policy made no business sense except to the extent Midwest would profit from the insured's death. We reject Wartnick's contention this testimony was irrelevant.

B. *Verdict form and jury instructions.*

■ The trial court submitted the following interrogatory to the jury: "Did defendant Wartnick murder or cause the murder of Robert Nachtsheim?" It rejected Wartnick's proposal: "Was defendant Wartnick the cause of an intentional act constituting Mr. Nachtsheim's murder?" Wartnick claims the significance of the distinction is that

in order for the jury properly to find appellant to be the cause of an intentional act constituting Mr. Nachtsheim's murder, it would have to have evidence * * * that appellant did some intentional act.

There is no substantive distinction between "murder" and "an intentional act constituting murder"; both require the jury to find that Wartnick committed an intentional act. The question submitted is simply in more intelligible form than the one requested by Wartnick. There was no claim or evidence, moreover, that the decedent was shot by accident. Wartnick's objection to the jury instructions is based on the same distinction and is equally without merit.

C. *Surprise.*

The trial court ordered the parties to exchange before trial "all exhibits intended to be introduced at trial." Wartnick claims certain exhibits received in evidence were not exchanged and so he is entitled to a new trial for surprise. (His brief does not specifically identify all the exhibits.) Nachtsheim responds that all the exhibits were either disclosed or offered for impeachment.

■ Whether to grant a new trial for surprise is largely within the discretion of the trial court and its decision will rarely be reversed on appeal. *Gunderson v. Olson,* 399 N.W.2d 166, 168 (Minn.Ct.App. 1987), *pet. for rev. denied* (Minn. Mar. 18, 1987). Even assuming his statement of the facts is true and Nachtsheim's false, Wartnick waived any claim of surprise by not requesting a continuance to look over the documents. *See id.; DeRemer v. Pacific Intermountain Express Co.,* 353 N.W.2d 694 (Minn.Ct.App.1984).

Wartnick also claims he was surprised because Nachtsheim's statement of the case said she was going to introduce the entire investigation file of the Minneapolis Police Department and the entire medical records of the Hennepin County Medical Examiner, but she only introduced parts of the files. Nachtsheim listed them, however, as exhibits she "may" offer.

### D. *Disqualification of trial judge.*

Wartnick had filed a notice to remove the judge initially assigned to the case under Minn.R.Civ.P. 63.03, and another judge was assigned to preside at trial. On the third day of trial, Wartnick moved for a mistrial based on the trial judge's involvement in the investigation of the murder when he was an assistant Hennepin County Attorney. Wartnick's attorney claims he did not know of the judge's prior involvement until the second day of trial, when the judge's name appeared on a file produced by Prudential. When it was brought to his attention that day, the judge stated:

> [W]hen this case came to me, I had a recollection of the facts from hearing it discussed in the office.
>
> * * * I have no recollection of any detailed analysis of it.
>
> * * * [E]verybody thought he was guilty * * *. I couldn't remember what happened. I just remember it happened and it was a florist. That's it.
>
> If I made any decisions, I don't remember it. I still don't think I made one. I don't feel I have any knowledge of it. * * * I don't remember anything about it * * *.
>
> *  *  *  *  *  *
>
> I could have read some police reports, but if I did, I have a total lack of remembrance.

Wartnick's attorney declined to move for a mistrial that day, but changed his mind and moved for one the next day. In denying his motion, the judge stated:

> I can't see any reason why I would be biased. * * *
>
> *  *  *  *  *  *
>
> * * * I don't feel what happened would make me decide the case any differently.

Nachtsheim's attorney contends the judge advised counsel before trial he had some "vague recollection" of the case being in the county attorney's office twelve years earlier. The judge also stated, while denying the mistrial motion, that before trial he had "disclosed that I knew some general things." For purposes of review, however, we will assume Wartnick's attorney had no prior knowledge of the trial judge's involvement.

Wartnick claims he is entitled to a new trial because the trial judge's failure to disqualify himself constitutes an irregularity in the proceedings that deprived him of a fair trial. Minn.R.Civ.P. 59.01. In order to meet this standard, Wartnick would have to show there was an irregularity in the proceeding, and that he was in fact deprived of a fair trial. He has shown neither.

First, since Wartnick had already disqualified one judge as a matter of right, he could only remove the trial judge by making an "affirmative showing of prejudice." Minn.R.Civ.P. 63.03; *Baskerville v. Baskerville*, 246 Minn. 496, 75 N.W.2d 762, 766 (1956).

> Bias or prejudice, to be disqualifying, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.

*In re Estate of Lange*, 398 N.W.2d 569, 573 (Minn.Ct.App.1986).

Wartnick argues the trial judge's statements that the prosecutors all thought he was guilty show the judge was prejudiced against him. Those statements described the judge's general impression approximately twelve years before trial. Taken in context, they do not establish that

the judge was biased at the time of trial. The judge stated that he could not remember any of the specific facts of the case, and that he "can't see any reason [why] I would be biased." The judge's decision not to remove himself was properly within his discretion. *See State v. Pierson*, 368 N.W.2d 427, 432 (Minn.Ct.App.1985).

■■■■ Wartnick argues the trial court should have disqualified himself because his presiding over the trial violated Canon 3(C)(1) of the Code of Judicial Conduct. Even assuming the Canon applies, it is not a basis for disqualifying a judge: Rule 63.03 explicitly makes an "affirmative showing of prejudice" the exclusive ground for removing a successor judge. Wartnick's reliance on cases emphasizing the importance of preserving the appearance of impartiality is similarly misplaced because those cases do not involve attempts to disqualify a successor judge. *See Payne v. Lee*, 222 Minn. 269, 24 N.W.2d 259 (1946); *Wiedemann v. Wiedemann*, 228 Minn. 174, 36 N.W.2d 810 (1949). Wartnick's contention that the trial judge's encouragement of a pretrial settlement reflects bias or was somehow improper is totally without merit.

■■■■ Second, Wartnick has failed to show he was denied a fair trial or was in any way prejudiced by the judge's failure to remove himself. The judge was not the trier of fact. All his rulings are on the record, and they show that the trial was conducted fairly. Wartnick does not suggest the trial judge attempted to communicate to the jury, in a way not reflected in the record, any feelings he might have had about the merits of the case.

III. *Punitive Damages.*

■■■■ Wartnick argues the issue of punitive damages should not have gone to the jury for two reasons.

1. The wrongful death act was amended in 1983 to provide for punitive damages "as provided in section 549.20." 1983 Minn. Laws ch. 347, § 2; Minn.Stat. § 573.02,

subd. 1 (1984). Appellant argues that the legislature could not have intended the punitive damages provision to apply here, despite the clear language to the contrary, because Minn.Stat. § 549.20, "the statute authorizing punitive damages," was not enacted until 1978 (after the decedent's murder).

This contention defies logic. The act's provisions explicitly apply to causes of actions arising prior to its enactment if they are based on murder. Minn.Stat. § 573.02, subd. 4 (1984). Also, § 549.20 does not authorize punitive damages, it limits them. *Minnesota-Iowa Television Co. v. Watonwan T.V. Improvement Association*, 294 N.W.2d 297, 310–11 (Minn.1980).

■■■■ 2. Wartnick argues there was insufficient evidence of his financial condition to submit the punitive damages issue to the jury. A party's financial condition is relevant to a determination of whether punitive damages are excessive. *E.g., Wilson v. City of Eagan*, 297 N.W.2d 146, 151 (Minn.1980). Once a plaintiff establishes the right to recover punitive damages it is incumbent upon the defendant to establish his inability to pay them. *See Melina v. Chaplin*, 327 N.W.2d 19 (Minn.1982). The evidence establishes that Wartnick is at least a part-owner of Midwest. He testified Midwest was essentially a "family operation" and that in 1972 or 1973 "he" had sales of $1,400,000. This is sufficient evidence of his financial condition. The trial court did not err in submitting the issue to the jury.

**DECISION**

Affirmed.