## BARON DESNICK v. JOSEPH MAST AND OTHERS.

249 N. W. 2d 878.

December 30, 1976—Nos. 45599, 45993.

---

*Robins, Davis & Lyons, Harding A. Orren,* and *John C. Hart,* for appellant.

*Jardine, Logan & O'Brien* and *Donald M. Jardine,* for respondent Mast.

*Altman, Geraghty, Mulally & Weiss* and *J. H. Geraghty,* for respondent Divine.

*Briggs & Morgan* and *David C. Forsberg*, for respondent Starkman.

Heard before Sheran, C. J., and Rogosheske, Peterson, Yetka, Scott, and Breunig, JJ.

PETERSON, JUSTICE.

Plaintiff, Baron Desnick, appeals from a judgment dismissing his claims against defendants Joseph Mast and Arnold Divine for alleged breach of professional duties and against defendant Stanley Starkman for an alleged breach of fiduciary duty to him as a co-adventurer with Starkman in the purchase of a business enterprise, and from an order denying his motion for a new trial. He also appeals from the part of the judgment in favor of Starkman on Starkman's counterclaim against Desnick. We affirm that part of the judgment dismissing Desnick's claims and remand for a new trial on Starkman's counterclaim.

Plaintiff, Baron Desnick, and his brother, Theodore, each owned 50 percent of a corporation which in turn owned Desnick Brothers Lexington Drug, Inc., a drugstore located at the intersection of Lexington and University Avenues in St. Paul. Defendant Stanley Starkman worked for Baron Desnick from the time he was about 12 years old, through high school, college, and pharmacy school. When he became a registered pharmacist he was made general manager of Lexington Drug. His duties included hiring and supervising employees and purchasing and paying for merchandise. He did not have a formal employment contract, but, rather, his employment was at will.

In 1969 Starkman received an offer from Richard Berg, owner of Carlson Drug in St. Paul, regarding an opportunity to manage one of Berg's St. Paul stores and to buy stock in Carlson Drug. They reached a preliminary agreement, and Starkman notified Desnick of his intention to terminate their employment relationship. Desnick wished to persuade Starkman not to accept the Berg offer and invited Starkman to a meeting to discuss it. Starkman and his wife went to the Desnicks' home and discussed

the matter until late at night. At that time Desnick and Starkman reached an oral agreement. Desnick was to cause Starkman's salary to be increased to approximately $25,000 per year, to arrange for Starkman's dues to be paid at Hillcrest Country Club, and to transfer without cost to Starkman a 20-percent interest in the stock of Lexington Drug. The consideration which Starkman was to provide in return is a subject of dispute. Starkman testified, and the trial court found, that Starkman's sole consideration was his rejection of the Berg offer. Desnick testified that the parties' bargain was for Starkman to remain in the employ of Lexington Drug.

Starkman's salary was increased, his country club dues were paid, but the stock was never transferred. Starkman continued working from 1969 until February 1972, and during that time had occasional conversations with Desnick about when the stock might be transferred.

In November 1971 defendant Arnold Divine approached Starkman and asked if he would be interested in purchasing Highland Drug Center, a drug store at Cleveland Avenue and Ford Parkway in St. Paul. The sellers, Mr. and Mrs. Harold Shapira, had offered Divine's accounting firm a $10,000 commission if the firm found a buyer for the store. Starkman consulted Desnick, who had previously considered buying the store, and the two together retained defendant Joseph Mast, an attorney, to prepare a purchase proposal for them to present to the sellers. The sellers rejected this proposal.

In January 1972 Divine again informed Starkman and Desnick that Highland Drug was for sale, and a meeting was arranged with the sellers. On February 4, 1972, the sellers and their attorney met with Desnick, Starkman, and Mast for the purpose of negotiating a possible sale. At the close of the meeting they came to an understanding, and there was handshaking all around. The testimony in the record showed, however, that the sellers' attorney, Jerome Simon, emphasized that there was another buyer waiting with an offer of equal magnitude, so the deal

would have to be consummated in writing before the close of business on February 8 or any prior agreements were to be terminated.

On Feburary 8 Desnick, Starkman, and Divine met at Divine's office, where they generated additional financial projections from data that had been acquired since the meeting of February 4. The oral statements that were made at this point are disputed. Starkman and Divine testified that Desnick said he was too old to go into the deal because he would not "enjoy the fruits" of his investment for several years. They testified it was clearly understood that the contract had to be signed on the 8th or the deal was off, and they testified that it was clear at the close of the February 8 meeting that Desnick was rejecting the contract and refusing to consummate the transaction. It was clear, by their testimony, that the sale as originally contemplated was accordingly terminated. Desnick, on the other hand, testified that the projections regarding the profitability of the enterprise were satisfactory to him, that he had never mentioned his age, and that he thought when everyone left the meeting that the deal was still going forward.

During the meeting on the 8th, Mast phoned Divine twice. Mast testified that during the second call Divine told him, "They've decided—they've gone over it and they're not going to take the deal. Neither one of them want it." He testified that later he talked to Divine privately and Divine explained that, because of his age, Desnick did not want to proceed further. At trial Desnick recalled Divine's receiving the two calls, but testified that he had no idea to whom Divine was talking on the phone. He was impeached by his prior statement in a deposition that he had assumed the caller was Mast. Desnick also testified that he did not know Divine was talking about him. From February 8 Desnick took no further steps to move the deal forward.

The next day, February 9, the sellers' attorney, Simon, called Mast. Mast told him the deal was off. Simon asked whether a day

or two would make a difference, and Mast said no. Simon spent approximately 5 hours that day negotiating with the other prospective buyers.

Starkman testified that when he went home after the meeting on February 8 his wife "laced into" him about his inability to acquire an ownership interest in a drug store, and Starkman then determined that he would attempt the purchase on his own without Desnick. He contacted Mast and implored him to present the previously prepared written contract to Simon with only Starkman's signature on it. Mast agreed, and he gave Simon the contract and Starkman's earnest money check. Simon said the store was already sold to the other buyers, but agreed to present Starkman's offer anyway. The sellers subsequently executed Starkman's purchase offer, and on February 14, Starkman told Desnick he had bought Highland Drug for himself.

Desnick thereafter sued Mast and Divine, contending that they breached a duty not to represent one joint venturer client to the detriment of another. After approximately a day and a half of trial before the district court of Ramsey County (Marsden, J.), the action was continued so that Desnick could amend his complaint and join Starkman as a defendant. When Starkman was joined he counterclaimed for specific performance on the alleged oral contract Desnick made to convey 20 percent of the stock in Lexington Drug.

The case was tried before Judge Hyam Segell sitting without a jury, and the trial concluded on Tuesday, October 22. The next day, Wednesday, October 23, Harding Orren, one of Desnick's counsel, was told by an associate in his firm that Judge Segell was a defendant in a professional malpractice suit and that he was being represented in that suit by James Geraghty, trial counsel for defendant Divine. Orren, who was leaving the country on Thursday, instructed his associate to look into the matter. On Friday, October 25, Judge Segell rendered his decision.

Judge Segell ordered judgment dismissing Desnick's claim on the grounds that Desnick had withdrawn from the venture and

as a result the others owed no duty to him. He also found Desnick liable on Starkman's counterclaim for 20 percent of the stock in Lexington Drug and retained jurisdiction to hear evidence on the value of that stock. On November 18, almost 1 month following the decision in the case, Desnick moved for amended findings of fact or in the alternative for a new trial on the ground, inter alia, that Judge Segell should have disqualified himself from hearing the case.

An advisory jury subsequently determined that in 1969, 20 percent of the stock in Lexington Drug was worth $34,500, and Judge Segell adopted this value as his own finding. Desnick did not object to Judge Segell's sitting for this purpose. Judge Segell went on to conclude that specific performance was inequitable because of the changed relationship of the parties. He decided to award money damages in lieu of specific performance, but he also concluded that because Starkman had not vigorously pursued his right to receive the stock equity, the amount of money damages should be reduced by 50 percent. Thus he ordered judgment on Starkman's counterclaim for $17,250.

We turn initially to Desnick's contention that he was denied a fair trial because there was an attorney-client relationship between Judge Segell and James Geraghty, who was trial counsel for defendant Divine. Desnick does not assert that Judge Segell had actual bias in favor of Geraghty's client or against his adversary, contending only that a new trial should be granted so as to avoid any appearance of impropriety. The circumstances of the relationship, noted in the margin, clearly indicate it was a technical, rather than a direct or a personal, relationship.[1] It

---

[1] This relationship arose because of a legal malpractice suit brought by Albert T. O'Neill, Sr. against one of Judge Segell's former law partners, in which action Judge Segell and all other members of his former firm were also joined as nominal parties. When he was served with the summons and complaint in that action, Judge Segell forwarded them through another firm member to St. Paul Fire & Marine Insurance Company, the insurance carrier for his former law firm. The insurer in turn retained James Geraghty to represent all the lawyers

would, of course, have been preferable for Judge Segell to have disclosed this relationship to all counsel, rather than to assume their knowledge of it, but we are fully satisfied that under the circumstances stated plaintiff was not denied a fair trial.[2]

We turn to whether the findings, pursuant to which the trial court dismissed Desnick's claim, were supported by the evidence. The trial court found that Desnick's refusal at the February 8 meeting to sign the purchase agreement evidenced his withdrawal from the venture entirely, and the court concluded that from the time of the refusal, all other parties had no duty to Desnick. Thus, Starkman was free to set upon a new venture without first obtaining Desnick's permission, and Mast and Divine were similarly free to render professional services to Starkman without obtaining Desnick's permission.

The evidence amply supports a finding that Desnick withdrew. Desnick's own testimony is contrary, but it was for the trial court to resolve conflicts in the evidence. There was strong evidence in the testimony of Starkman, Mast, Divine, and Simon that Desnick withdrew. Clearly Divine believed it, or he wouldn't have told Mast the deal was off. Clearly Mast believed it, or he wouldn't have told Simon the deal was off. Clearly Starkman believed it, or he wouldn't have told his wife the deal had fallen through. Clearly Simon believed it, or he would not have spent 5 hours the next day negotiating with another prospective buyer and later tell Mast that the store had been purchased by the other

who were being sued, including Judge Segell. Judge Segell received four items of correspondence from Geraghty and wrote to him once about the case, but never had any formal conference concerning the lawsuit. He expected to be dismissed from the suit either before or at the time it came on for trial. Judge Segell did not disclose the relationship because he assumed that counsel were aware of it.

[2] Because the propriety of Judge Segell's participation in the case has been challenged, we expect that he would prefer not to sit further on the case. We will therefore order that the new trial hereinafter ordered with respect to a counterclaim asserted by defendant Starkman shall be before a new judge.

buyer. We cannot say, therefore, that the trial court's finding that Desnick withdrew was clearly erroneous, and it follows that Starkman, Mast, and Divine had no duty to Desnick not to proceed without him.

Desnick raises a number of arguments attacking judgment entered against him on Starkman's counterclaim. He contends, first, that Starkman's measure of recovery, if any, should be the loss Starkman suffered by reason of continuing his employment with Desnick in reliance upon the contract Starkman claims Desnick breached. However, if Desnick breached a contract to transfer to Starkman 20 percent of the stock of the corporation, then the proper measure of recovery would place Starkman in the same position he would have been in had Desnick not breached. In this instance, if specific performance is not granted, the damages should be based upon the value of 20 percent of the corporate stock which was to be transferred as part of the consideration.

Desnick contends, second, that Starkman did not contract with him personally, but with the corporation, and that any judgment therefore should have been entered not against him personally but against the corporation. The evidence is ample, however, to show that Desnick did agree with Starkman personally and not solely on behalf of the corporation. The evidence shows that he personally undertook to cause the corporation to raise Starkman's salary, that he personally undertook to cause Lexington Drug to pay Starkman's membership in the country club, and that he personally undertook to convey 20 percent of the stock to Starkman. Furthermore, the corporation was unable to fulfill a promise to convey stock, because it owned none. All stock was owned by Desnick and his brother.

Desnick contends, third, that Starkman's counterclaim is barred by laches because from the date of their agreement in 1969 until Starkman purchased Highland Drug Center in February 1972, Starkman asked Desnick only occasionally when he would obtain the stock rather than making a formal demand for it, and

because after February 1972 he made no further request for the stock until he brought his counterclaim against Desnick in December 1973. An essential element of laches, however, is that the party asserting it be prejudiced by the delay. Modjeski v. Federal Bakery of Winona, Inc. 307 Minn. 432, 240 N. W. 2d 542 (1976); Sanvik v. Maher, 280 Minn. 113, 116, 158 N. W. 2d 206, 208 (1968); Lemmer v. Batzli Electric Co. 267 Minn. 8, 15, 125 N. W. 2d 434, 439 (1963); Steenberg v. Kaysen, 229 Minn. 300, 310, 39 N. W. 2d 18, 23 (1949). The record fails to disclose that Desnick was in any way prejudiced by Starkman's not having brought formal action to enforce the stock transfer contract sooner. Rather, it appears that any delay was to Desnick's advantage, for it enabled him to enjoy the benefits of the stock for a longer period of time. Desnick contends that he has in fact changed his position to his detriment in that he has purchased his brother's half of the corporation and thus, he argues, he has doubled his exposure should the corporation be found obligated to convey 20 percent of the stock. The trial court found, however, that Starkman contracted with Desnick personally and not with the corporation, and therefore Desnick's obligation is unchanged by his acquisition of his brother's interest in the corporation.

Desnick also contends that Starkman abandoned any contractual rights he may have had, because he acquiesced in Desnick's failure to convey the stock. A repudiation by one party to a contract if acquiesced in by the other party is tantamount to a rescission. Whether a contract has been rescinded by mutual consent is a question for the trier of fact, but mutual abandonment, cancellation or rescission must be clearly expressed, and acts and conduct of the parties to be sufficient must be positive, unequivocal, and inconsistent with the existence of the contract. Country Club Oil Co. v. Lee, 239 Minn. 148, 154, 58 N. W. 2d 247, 251 (1953). The trial court's findings on the issue of abandonment were somewhat ambiguous. In its memorandum the court indicated that it believed that Starkman "had very little interest in asserting his claim" and that he "needed very little encourage-

ment, in any event, to be dilatory." Since the court entered judgment for one-half the full value of 20 percent of the stock as found by the court, apparently it concluded that Starkman had half abandoned his claim for the stock. However, a contract is either fully abandoned by the parties or not abandoned at all. On remand the court will be able to assess again whether Starkman abandoned his rights under the contract.

The trial court, believing Starkman's testimony, found that the sole consideration which Desnick bargained for and which Starkman was to provide was Starkman's rejection of the offer that Berg had made him. In spite of Desnick's testimony to the contrary, the court believed that Starkman's continuing to work for Desnick Brothers Lexington Drug was a mere ancillary benefit that Desnick did not bargain for. Rule 52.01, Rules of Civil Procedure, provides that the findings of fact of the district court shall not be set aside unless clearly erroneous; but the trial court's findings may be held clearly erroneous notwithstanding evidence to support such findings, if the reviewing court is left with the definite and firm conviction that a mistake has been made. In re Trust Known as Great Northern Iron Ore Properties, 308 Minn. 221, 243 N. W. 2d 302 (1976). It is incredible that Desnick would have agreed to convey 20 percent of his business to Starkman without any commitment at all from Starkman to continue working there. The record plainly shows that Desnick's purpose was not to injure Berg by preventing Starkman from joining him, but to keep Starkman in the employ of Desnick's own drugstore business. It is therefore entirely unreasonable to conclude other than that a part of the bargain was for Starkman to continue working for Desnick's corporation for some period of time.

For how long a period Starkman was to stay is not disclosed by the record presently before us but will be addressed by the trial court on remand. If the court finds, for example, that in exchange for the stock transfer Starkman was to remain as long as Desnick wished, then it may also find that Starkman breached

the contract by leaving his employment and that he may not therefore still claim the stock or its value in money. If, however, the court finds that Desnick bargained for Starkman to reject the Berg offer and stay with Desnick only as long as Starkman wished, then it may find that Starkman did not breach his promise by terminating his employment approximately 3 years subsequent to the agreement. We do not wish to suggest what finding the trial court will make on remand, whether it will be one of the above or some other; for example, that Starkman impliedly agreed to stay for a reasonable time. We raise them as possibilities only to emphasize the necessity on remand for explicit findings because the consequences may vary so dramatically according to the exact nature of Starkman's bargained-for consideration.

Finally, Desnick contends that Starkman's promise was not legally sufficient consideration to establish an enforceable contract. This argument overlooks the trial court's finding that Desnick also bargained for Starkman to reject the Berg offer, an act that would certainly benefit Desnick because after rejecting the Berg offer Starkman would probably continue working for Desnick's corporation. The Berg offer was of sufficient definiteness and value that Starkman was willing to quit his job with Desnick in order to pursue it. To reject it was a substantial detriment to Starkman, and if Desnick chose to bargain for that rejection then it was legally sufficient consideration to support an enforceable contract.

While we affirm that part of the trial court's judgment dismissing Desnick's claims against Starkman, Mast, and Divine, we reverse and remand for a new trial, before another judge, on Starkman's counterclaim because, as discussed above, the findings supporting the judgment on the counterclaim were clearly erroneous.

Affirmed in part, reversed in part, and remanded.

MR. JUSTICE KELLY and MR. JUSTICE MACLAUGHLIN took no part in the consideration or decision of this case.

The petition for rehearing is denied. The original opinion filed in this case on November 19, 1976, is withdrawn and this opinion is substituted therefor.